UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DISTRICT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | NO. 3:09-00186-4 |
| v. | ) | |
| | ) | Judge Trauger |
| HUGO SEPULVEDA | ) | |

**UNITED STATES' RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS**

The United States of America, through Edward M. Yarbrough, United States Attorney for the Middle District of Tennessee, and Brent A. Hannafan, Assistant United States Attorney, hereby responds to the defendant's Motion to Suppress (the "Motion") (Docket Entry 146). The United States requests that this Court deny the Motion for the reasons stated below.

**INTRODUCTION**

Defendant moved to suppress evidence found in his residence during a warrantless search by the Drug Enforcement Administration on August 14, 2009. The basis for the defendant's Motion is that warrantless searches are presumptively illegal. However, the defendant correctly stated in the Motion that while warrantless searches are presumptively illegal, there are '"a few specifically established and well-delineated exceptions,' **including consent searches** and searches made incident to a lawful arrest." (Motion at 2)(emphasis added). Although the Motion acknowledged that consent searches are legal, the defendant failed to advise this Court that the defendant's parents, who owned and lived in the residence on the date of the search, consented to the search.

The fact that the defendant's parents gave their consent is described in the first line of Paragraph 28 of DEA Task Force Officer Andrew Green's Affidavit, filed in support of the

1

complaint in this case on August 14, 2009 (hereinafter "the Affidavit") (Docket No. 1). The Motion cited to and relied upon four paragraphs of the Affidavit, including Paragraph 28, as Exhibit 1 to the Motion. However, the Motion didn't attach or even quote the cited paragraphs of the Affidavit. An entire copy of the Affidavit is therefore attached hereto as Exhibit 1.

Similarly, the Motion did not advise this Court that in addition to the defendant's parents orally consenting to the search, the defendant's father also signed a DEA consent to search form. (Attached hereto as Exhibit 2).[1] The fact that the defendant's father executed the consent form was disclosed in discovery to the defendant well before the defendant filed the Motion.

When seeking to suppress evidence, a defendant carries the burden of articulating a theory that would warrant suppression under the exclusionary rule. *United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003) ("[I]n seeking suppression of evidence the burden of proof is upon the defendant to display a violation of some constitutional or statutory right justifying suppression."); *United States v. Feldman*, 606 F.2d 673, n.11 (6th Cir. 1979) ("It is well settled that in seeking suppression of evidence the burden of proof is upon the defendant to display a violation of some constitutional or statutory right justifying suppression."). The Motion did not contest the indisputable fact that the defendant's father signed a consent to search form, the defendant has failed to articulate a legally cognizable challenge to the validity of the search. Unless the defendant presents a factual dispute as to his parents' consent in his reply brief, there will be no reason for this Court to hold an evidentiary hearing on the Motion and this Court should deny the Motion without a hearing.

---

[1] The consent form was written in Spanish. An English translation of the executed form is attached as Exhibit 3.

However, if the defendant attempts to raise some factual dispute as to his parents' consent in his reply brief, the United States respectfully requests that this Court grant the United States three business days to file a response to that reply, and for this Court to continue the evidentiary hearing to a date later than the currently scheduled date, November 13, 2009. More important, as stated in the United States Motion to Continue the Suppression Hearing, a key witness for the United States, a DEA agent who witnessed Mr. and Mrs. Sepulveda's consent, will be on assignment out of the district on November 13, 2009.

## FACTS

**Background of the Investigation**

The indictment in this case was the result of a long-term investigation by the DEA into a large-scale cocaine distribution conspiracy in the Middle District of Tennessee and elsewhere. As sole support for the facts alleged in the Motion, the defendant relied upon Paragraphs 25-28 of the Affidavit of Officer Green filed in support of the complaint against the defendant and six of his co-defendants (the complete Affidavit is attached as Exhibit 1). The United States relies upon the facts described in the Affidavit, as well as additional relevant facts described in this response, and the anticipated testimony by witnesses at the evidentiary hearing, in support of its request that this Court deny the Motion.

As described in the Affidavit, the DEA's investigation in Nashville initially stemmed from a DEA investigation of a cocaine conspiracy in Atlanta. The investigation in Nashville ultimately involved six Title III court-authorized wiretaps in the Middle District of Tennessee. District Court Judge Todd J. Campbell authorized the first wiretap in October 2008, and one wiretap (the fourth one Judge Campbell authorized, hereinafter "Target Telephone 4") began in

3

May 2009 and was being still being intercepted by the DEA as of August 14, 2009, the date of the search at issue and the arrest of seven of the defendants.

Based upon its investigation, the DEA believed that the members of the conspiracy had possessed and distributed multi-kilograms of cocaine in Nashville. The DEA had identified the defendant, along with his brother, co-defendant, Francisco Jorge Sepulveda a/k/a George (hereinafter "George"), as members of the conspiracy. The DEA believed that the defendant and George worked closely with the head of the conspiracy's operations in Nashville, the lead defendant in this case, Mauricio Orozco-Rios a/k/a Guicho (hereinafter "Guicho") (Target Telephone 4 was Guicho's phone.) Both the defendant and George had been intercepted numerous times over Target Telephone 4 prior to the date of the search and their arrest, August 14, 2009. Finally, prior to August 14, 2009, based upon its surveillance and intercepted calls, the DEA knew that the defendant and George resided at 3741 East Ridge Drive in Nashville.

**Arrest of the Defendant and Six Co-defendants on August 14, 2009**

Beginning on August 13, 2009, and continuing into the early morning hours of August 14, 2009, the DEA intercepted numerous calls over Target Telephone 4 which indicated that a co-defendant in this case, Marcos Arriaza-Rios (hereinafter "Marcos"), was driving to Atlanta to pick up what the DEA believed to be a large load of cocaine. The calls also indicated that Marcos was going to pick up another co-defendant who resided in Atlanta, Martin Martinez a/k/a Juve (hereinafter "Juve"). Based upon the intercepted calls, the DEA believed that Marcos and Juve would return from Atlanta early in the morning on August 14. During one of those intercepted calls, George told Guicho to tell Marcos to drive to his and the defendant's residence and to park the load vehicle at the back of the house.

Based upon the timing of the trip that George and Guicho discussed in the intercepted calls, the DEA anticipated that Marcos and Juve would arrive at the defendant's residence at approximately 5:00 a.m. on August 14. Therefore, agents and officers (hereinafter collectively "agents") were positioned in the vicinity of the defendant's residence at that time.

At approximately 5:15 a.m., a Toyota Solara arrived at the defendant's residence. The DEA had previously identified the Solara as a vehicle which agents believed the organization used to transport cocaine and cash to and from Atlanta. Marcos and Juve (both of whom the DEA had previously identified as members of the conspiracy) were inside the Solara when it arrived at the defendant's residence. The vehicle parked behind the defendant's residence, just as George had asked Guicho to tell Marcos to do. At that time, agents quickly moved in to place Marcos and Juve into custody, as well as to determine if the defendant and George were present at the residence.

As the agents approached the residence in both marked and unmarked vehicles, and announced that they were law enforcement, Juve and George were standing outside behind the residence next to the vehicle. The back door to the residence was open. Agents knocked on the back door, announced their presence through the open door, and then entered the house. Agents also encountered Marcos as he was walking away from the residence and detained him. Agents placed Juve, George, and Marcos into custody.

When they entered the residence, agents found the defendant locked inside his bedroom. The agents ultimately had to break down his bedroom door because the defendant refused to respond to their knocking and repeated requests that he unlock the door. When agents entered the defendant's room, they immediately observed a loaded semi-automatic pistol sitting on a

5

night stand next to his bed. The handgun was within arm's reach of the defendant. Also in plain view was a body armor vest in the bedroom closet. Agents secured the firearm while the defendant was taken into custody. However, agents did not seize the body armor or search the bedroom at that time. Agents ultimately placed Marcos, Juve, George, and the defendant in handcuffs and seated them in the living room of the residence.

After agents secured the residence, the majority of agents left the residence and went to Guicho's residence a few blocks away. The four defendants, as well as the defendant's parents, his two younger sisters (ages 13 and 14), and two other minors (the defendant's children) who were present in the home, remained in the living room under the supervision of several remaining agents. The defendant's residence was not searched, other than in the immediate vicinity of where the individuals were seated in the living room for safety purposes, prior to when agents left for Guicho's residence.

**The Sepulvedas' Consent to the Search**

Shortly before 6:00 a.m., approximately twenty minutes after agents had left for Guicho's residence, DEA Task Force Officer Andrew Green (the affiant for the Affidavit attached as Exhibit 1) and DEA Special Agent Clay Morris[2] asked the defendant's parents, Francisco Sepulveda and Maria Rosa Sepulveda, to speak with them. The Sepulvedas agreed to speak with the agents and the four of them stepped outside the residence. Once outside, Agent Morris and Officer Green explained to Mr. and Mrs. Sepulveda that they were not under investigation or arrest, but that the agents believed their sons were involved in a conspiracy to distribute cocaine.

---

[2] Special Agent Morris is the agent who will be out of the district on a work assignment on November 13, 2009.

6

Mr. Sepulveda informed the agents at that time that he was the owner of the residence. Agent Morris and Officer Green observed that Mr. Sepulveda understood and spoke some English and that Mrs. Sepulveda understood and spoke English very well. Agent Morris explained to Mr. and Mrs. Sepulveda that the DEA wanted to search their residence. Agent Morris then asked them if they would consent to a search. Agent Morris did not threaten them that the DEA would obtain a search warrant for the house if they did not give their consent.

Agent Morris provided the Sepulvedas with a DEA consent to search form written in Spanish and explained the purpose of that form to them. Agent Morris and Officer Green asked both Mr. and Mrs. Sepulveda to read the consent form aloud. After they each read the consent form aloud in the presence of the agents, Agent Morris and Officer Green asked the Sepulvedas if they would give their consent to a search of their home. The Sepulvedas both stated that they would consent to a search of their house. Mr. Sepulveda then signed the consent form at 6:00 a.m. in front of his wife, Agent Morris, and Officer Green. Agent Morris and Officer Green signed the consent form as witnesses. (Exhibits 2 and 3). After Mr. Sepulveda executed the consent form, agents began to search the residence.

**Evidence Seized on August 14, 2009**

Upon searching the residence, agents found what appeared to be a drug ledger, a bag of rubber bands, and an unused plastic heat-seal bag in George's bedroom. Agents also found a user quantity of powder cocaine in George's wallet in his bedroom.

Inside the defendant's bedroom, in addition to the loaded semi-automatic handgun seized at the time agents placed the defendant into custody, agents found a second loaded handgun, a revolver, as well as numerous rounds of ammunition, the body armor vest they previously

7

observed in his closet, a bag of rubber bands, a money counter, and plastic shrinkwrap. Agents also found several cellular telephones that had been intercepted over the wiretap of Guicho's phone (Target Telephone 4) inside the residence.

Also on the morning of August 14, Juve gave written consent to the DEA to search the Solara that he and Marcos arrived in from Atlanta. Agents ultimately discovered hidden compartments under the floor of the front seats of the vehicle which held nine wrapped packages. The substance inside those nine packages tested by a DEA laboratory and was determined to be approximately nine kilograms of cocaine.

Finally, later that same day, DEA agents in Atlanta, who were alerted to what happened in Nashville, went to a suspected stash house of the organization outside Atlanta. Agents had previously observed the same Solara being dropped off at the suspected stash house in June 2009 after it was driven to Atlanta by a co-defendant, Renso Noriega a/k/a Levi and Juve, and then back to Nashville with both Levi and Juve in the vehicle, while under DEA surveillance. When the DEA agents in Atlanta searched the suspected stash house, they found 76 packages wrapped in a manner consistent with the nine packages of cocaine seized from the Solara earlier that morning. A DEA laboratory tested the substance in those packages and determined it was approximately 76 kilograms of cocaine.

## ARGUMENT

The United States concurs with the defendant's position that the Fourth Amendment generally prohibits warrantless searches of homes. *See United States v. Haddix*, 239 F.3d 766, 767 (6th Cir.2001). This general prohibition, however, does not apply when agents obtain voluntary consent from a individual whose property is searched. *See United States v. Gillis*, 358

F.3d 386, 390 (6th Cir.2004) (citing *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990)). The question of whether a consent to search is voluntary and knowing is a question of fact to be determined from the totality of the circumstances. *United States v. Abdullah*, 162 F.3d 897, 902 (6th Cir. 1998)(relying upon *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973)). The totality of circumstances in this case demonstrates that the defendant's parents' consent was voluntary and knowing.

The defendant's parents, Francisco and Maria Sepulveda, owned and resided in 3741 East Ridge Drive on August 14, 2009. Therefore, they had the authority to consent to the search of their residence. Agent Morris and Officer Green explained to Mr. and Mrs. Sepulveda why the DEA was present and why they wanted to search the Sepulvedas' home. They provided the Sepulvedas with a DEA consent to search form written in Spanish. The agents then observed both of the Sepulvedas read the form aloud in Spanish.

After Mr. and Mrs. Sepulveda each read the form aloud, the Sepulvedas orally consented to the search. Mr. Sepulveda then executed the form in the presence of his wife and the agents. The form stated that Mr. Sepulveda had been asked by the DEA for authorization to search 3741 East Ridge Drive, that he had not been threatened or coerced in any way, and that he had been asked to sign the consent statement. (Exhibits 2 and 3).

As will be more fully described at the evidentiary hearing (should this Court determine one is warranted), at no time did anyone with the DEA attempt to coerce or threaten the Sepulvedas into providing their oral consent or to Mr. Sepulveda signing the consent form. Further, as could be described at an evidentiary hearing, Agent Morris and Officer Green had no reason to believe that the Sepulvedas did not understand why they were being asked for their

9

consent or that either of them did not understand what they were doing when they consented to the search. At no time did the Sepulvedas tell the agents that they could only consent to a search of part of their home, that they wished to limit their consent, that they later wished to withdraw their consent.

Additionally, approximately thirty minutes had elapsed between the time agents entered the residence and when Agent Morris and Officer Green asked the Sepulvedas to speak with them. This is not a case where agents immediately sought a consent to search as they burst through the door into a home. The Sepulvedas had ample time to consider what was happening before the agents asked them for their consent. Based upon the totality of the circumstances in this case, this Court should find that the Sepulvedas' consent was given knowingly and voluntarily and deny the defendant's Motion.

As a final point, just as the defendant correctly stated in the Motion that consent searches are a recognized exception to a warrantless search, the defendant correctly stated that searches incident to a lawful arrest are also a recognized exception. Even if this Court were to find that the evidence found in the residence after the Sepulvedas gave their consent to search should be suppressed, the loaded firearm found next to the defendant's bed and the body armor in his closet were both in plain view of the agents when they took the defendant into custody. Therefore, both pieces of evidence would be admissible against the defendant because they were seized incident to a lawful arrest.

## CONCLUSION

For the reasons stated above, the United States respectfully requests that this Court grant the United States time to respond to the defendant's reply, continue the evidentiary hearing set for November 13, 2009, and, ultimately, deny the defendant's Motion.

Respectfully submitted,

EDWARD M. YARBROUGH
United States Attorney for the
Middle District of Tennessee

By: **s/ Brent A. Hannafan**
Brent A. Hannafan
Assistant United States Attorney
A-961 U.S. Courthouse
ll0 Ninth Avenue South
Nashville, Tennessee 37203
Telephone: 615-736-5151

## CERTIFICATE OF SERVICE

I hereby certify that on November 6, 2009, I electronically served one copy of the United States' Response to the defendant's Motion to Suppress with the Clerk of the Court by using the CM/ECF system, which will send a Notice of Electronic Filing to counsel for the defendant, Mr. Michael Terry and Ms. Stephanie Gore.

**s/ Brent A. Hannafan**
Brent A. Hannafan
Assistant U. S. Attorney
110th Avenue South, A96l
Nashville, Tennessee 37203
Phone: 615-736-5151
